UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

KIETH E. MEDASH and          :
DANIELLE MEDASH, Parents
and Guardians of E.M.M., a   :
minor,
                             :
          Plaintiffs,          CIVIL ACTION NO. 3:25-CV-1732
                             :
    v.                       (JUDGE MANNION)
                             :
COUNTY OF LUZERNE,
LUZERNE COUNTY CHILDREN,      :
YOUTH & FAMILIES, SHERRI
HARTMAN, and JESSICA TIMEK,   :

          Defendants.          :

## MEMORANDUM

Defendants County of Luzerne, Luzerne County Children, Youth & Families, Sherri Hartman, and Jessica Timek ("Defendants") present the Court with its motion to dismiss Plaintiffs Kieth E. Medash's and Danielle Medash's, guardians of E.M.M., a minor, ("Plaintiffs") amended complaint for failure to state a claim upon which relief can be granted, and accompanying brief. (**Docs. 16, 17**). For the reasons set forth below, Defendants' motion will be **DENIED.**

I.    BACKGROUND

The underlying cause of action is brought before the Court pursuant to 42 U.S.C. §1983 for the injuries E.M.M., an infant, sustained while in his

natural parents' custody. (Doc. 15). Plaintiff alleges that Andrew Carter and Brittany Cooper (collectively, "natural parents") were known to Defendants due to their "extensive criminal history, noncompliance with court ordered services, and their significant involvement with Luzerne County Children Youth & Families for many years including the termination of parental rights of their prior children." (Doc. 15 at 2-3). Andrew Carter, aged twenty-nine, has a "history of substance abuse and domestic violence as well as an extensive criminal history." *Id.* at 10. Brittany Cooper, aged twenty, has a history of mental health diagnoses. *Id.* Both natural parents have been involved with the Luzerne County Drug Court. *Id.* According to Plaintiffs, the natural parents had two prior children removed from their care and parental rights terminated. Specifically, "[o]n August 31, 2018, the natural parents' rights to one child were involuntarily terminated . . . On November 14, 2019, the natural mother . . . relinquished her parental rights to the other child [and] . . . the natural father . . . had his parental rights to the other child involuntarily terminated." *Id.* at 11.

Plaintiffs are the adoptive parents and guardians of E.M.M. and E.M.M.'s two older siblings, who were removed from the natural parents' custody after their parental rights were terminated. *Id.* at 5. Prior to E.M.M.'s birth, Plaintiff Danielle Medash notified Defendant Hartman that the natural

parents were expecting a third child. *Id.* at 7. Danielle Madash was concerned that the natural parents were incapable of parenting, due in part to their inability to comply with court-ordered services related to their prior termination of parental rights. *Id.* at 7-8.

On May 6, 2020, E.M.M. was born at Geisinger-GMC hospital. *Id.* at 3. Two days later, Defendants Hartman and Timek completed a preliminary assessment and scored the overall risk to E.M.M. as "high." *Id.* At the time of the assessment, the natural parents had not completed court-ordered services "including parenting education, mental health evaluations, substance abuse services, and batterer's intervention[,]" which was allegedly known to Defendants. *Id.* at 3-4. Plaintiffs allege that despite such knowledge, "Defendants affirmatively chose to forego an emergency shelter care hearing and file a dependency petition." *Id.* at 4. Nonetheless, Defendants determined that E.M.M. was "safe," meaning that E.M.M. could "safely remain in the current living arrangement or with the caregiver(s) of origin." *Id.* at 13.

On May 13, 2020, Defendants created an initial service plan. *Id.* at 15. The next day, Defendant Timek filed a dependency petition. *Id.* The court scheduled an adjudicatory hearing for June 5, 2020. *Id.* On June 4, 2020, one day before the hearing, E.M.M. was brought to the Wilkes-Barre

- 3 -

emergency department and subsequently transferred to Geisinger Wyoming Valley because he was listless. *Id.* at 16. "E.M.M. had severe and significant brain damage with decreasing levels of consciousness, at least three skull fractures, suspected seizures, and a healing jaw fracture . . . [t]he cause of these injuries was determined to be abusive brain trauma." *Id.* at 16. Andrew Carter was arrested for physical abuse of E.M.M. and pleaded guilty to related charges. *Id.* at 17. He was sentenced to serve 60-120 months of incarceration followed by a period of probation. *Id.*

Plaintiffs commenced the underlying action on September 16, 2025. (Doc. 1). After Defendants filed a motion to dismiss the complaint, Plaintiffs filed an amended complaint with jury demand. (Docs. 12, 15). On December 12, 2025, Defendants filed the immediate "motion to dismiss the amended complaint" and brief in support. (Docs. 16, 17). Plaintiffs filed their brief in opposition to Defendants' motion on December 29, 2025. (Doc. 18). Defendant filed a reply brief on January 12, 2026. (Doc. 20). This matter is now ripe for disposition.

## II.    LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). This standard "does not require detailed

- 4 -

factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A complaint that contains only "labels and conclusions," or a "formulaic recitation of the elements of a cause of action" does not comply with Rule 8. *Id.*

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The moving party bears the burden of showing that no claim has been stated, and dismissal is appropriate only if, accepting all the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating "no set of facts" language found in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. *Id.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on

- 5 -

its face." *Iqbal*, 556 U.S. at 678. Facial plausibility is achieved "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility does not require probability but "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "merely consistent with" liability do not satisfy this standard. *Id.*

As noted above, the Court at this stage accepts the complaint's factual allegations as true. This tenet "is inapplicable to legal conclusions." *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The federal pleading standard requires that district courts conduct a two-part analysis:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. In other words, a complaint must do more than allege the plaintiff's

> entitlement to relief. A complaint has to show such an entitlement with its facts.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal citations and quotations omitted).

## III.   DISCUSSION

By itself, §1983 does not create any rights, "but provides a remedy for violations of those rights created by the Constitution or federal law." *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 907 (3d Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)) ("In order to state a claim, plaintiff must show that defendants, acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States."). Plaintiffs base their 42 U.S.C. §1983 complaint upon two theories: (1) state-created danger, and (2) a *Monell* claim for unlawful customs, practices, and policies. (Doc. 15 at 20, 25). Defendants argue that both grounds of Plaintiffs' complaint should be dismissed pursuant to Rule 12(b)(6). (Doc. 17 at 5). The Court addresses each theory in turn.

### A. §1983 and State-Created Danger

The state-created danger theory originates from the case *DeShaney v. Winnebago County Dep't of Social Serv.*, 489 U.S. 189 (1989):

> The petitioner in that case was a young boy who was chronically abused by his father. The county department of

- 7 -

> social services, after receiving many complaints about the boy's mistreatment, took several steps to ensure his safety. But despite these efforts, the boy remained in his father's custody, and was eventually beaten so savagely that he suffered severe brain damage. The boy and his mother sued the department of social services under the "special relationship" theory of 42 U.S.C. §1983 for their failure to protect the boy from his father.

*Morse*, 132 F.3d at 907 (citing *DeShaney*, 489 U.S. at 195-96). Although the *DeShaney* Court ultimately rejected the claim, it stated that "[w]hile the State may have been aware of the dangers that [the young boy] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* (quoting *DeShaney*, 489 U.S. at 201). Based on that language, several courts have allowed claims under the state-created danger theory. *Id.*

The state-created danger theory was adopted in this circuit by *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996). The *Kneipp* Court held that a state actor could be liable if:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Id.* at 1208. The question then becomes whether Plaintiffs' complaint contains "sufficient factual matter, accepted as true," to plausibly support each element of the *Kneipp* test. *Iqbal*, 556 U.S. at 678. The Court holds that it does. Upon discovery's completion, Plaintiffs "may well be able to prove facts that would satisfy the four elements of the state-created danger analysis" with respect to Defendants. *Phillips v. County of Allegheny,* 515 F.3d 224, 237 (3d Cir. 2008).

### 1. Foreseeable and Fairly Direct Harm

"The first element of the *Kneipp* test requires that the harm ultimately caused was a foreseeable and a fairly direct result of the state's actions." *Morse*, 132 F. 3d at 908. In *Morse*, a teacher was shot and killed by a local resident with a history of mental illness. *See id.* at 904. Leading up to the shooting, several contractors propped open the back entrance of the school building, through which the shooter entered. *See id.* The teacher's estate brought a complaint alleging that the school was liable under the state-created danger theory of §1983. *See id.* at 905.

After an appeal from a granted motion to dismiss, the United States Court of Appeals for the Third Circuit held that the school "could not have foreseen that allowing construction workers to use an unlocked back entrance for access to the school building would result in the murderous act

- 9 -

of a mentally unstable third party[.]" *Id.* at 908. The court noted that the complaint did not allege that the defendants were aware of the shooter's violent propensities, nor that the defendants were aware of anyone posing a threat to anyone at the school. *See id.* Additionally, the court stated that "it was not [the] defendants' decision to allow the rear entrance to the school to remain open that precipitated or was the catalyst for the attack on [the teacher]." *Id.*

Here, the facts are distinguishable from those set forth in *Morse*. In Plaintiffs' complaint, Plaintiffs allege that Defendants were aware of the natural parents' history with drug addiction and domestic violence. (Doc. 15 at 10-12). Additionally, Plaintiffs claim that Defendants knew and advocated that the natural parents had their parental rights terminated with respect to their two other children. *Id.* at 8. Plaintiff Danielle Medash allegedly contacted Defendants (at least three times) about her concerns with E.M.M.'s safety in the natural parents' care. *Id.* Moreover, Defendants determined that E.M.M. was at a "high risk" two days after he was born. *Id.* at 12. Unlike the defendants in *Morse*, who had no awareness of the assailant's violent propensity, Plaintiffs allege that Defendants were keenly aware of Andrew Carter's history of violence and inability to parent his children. Therefore,

Plaintiffs have presented plausible evidence that the Defendants could have foreseen that E.M.M. would be injured by his father's hand.

In *Morse*, the causal chain between the defendants leaving the school door open and the homicide by a mentally unstable third party was "too attenuated." *Morse*, 132 F. 3d at 909. However, here, the causal chain is much more direct. In this case, Defendants visited the hospital to determine whether it was safe for E.M.M. to remain with the natural parents. (Doc. 15 at 12). Plaintiffs allege that although Defendants found E.M.M. to be at "high-risk," they determined that E.M.M. could safely remain in the natural parents' custody. *Id.* at 13. These facts are parallel to those set forth in *Wood v. Ostrander*:

> The plaintiff in *Wood* was the female passenger of a drunk driver who was pulled over late one evening by police. The driver was arrested and the car impounded, leaving Ms. Wood stranded on the road in a notoriously high crime area. After beginning the five mile walk to her home, Ms. Wood accepted a ride from an unknown man who subsequently took her to a secluded area and raped her. Addressing the issue of foreseeable harm, the court noted that the "inherent danger facing a woman left alone at night in an unsafe area is a matter of common sense."

*Morse,* 132 F. 3d at 909 (citing 879 F.2d 583 (9th Cir. 1989)) (internal citations omitted). Here, like in *Wood*, Plaintiffs allege that Defendants knew a vulnerable person was in an unsafe situation, yet affirmatively chose to

- 11 -

leave them there. According to Plaintiffs, Defendants marked E.M.M. as "high-risk," yet allowed the natural, historically violent parents to maintain custody. This choice is comparable to a police officer leaving a woman stranded in a high crime area. Thus, Plaintiffs have presented plausible evidence that the Defendants' decision to initiate dependency proceedings, but not to remove E.M.M. from the custody of parents with a known, recent history of violence "fairly direct[ly]" caused E.M.M.'s injuries. *Morse,* 132 F. 3d at 908.

Plaintiffs' complaint contains "sufficient factual matter, accepted as true, to state a [plausible] claim" that E.M.M.'s injuries were foreseeable and directly resulted from Defendants' acts. *Iqbal,* 556 U.S. at 678.

### 2. Willful Disregard for Plaintiff's Safety

"The second prong of the *Kneipp* test asks whether the state actor acted with willful disregard for or deliberate indifference to plaintiff's safety." *Morse,* 132 F.3d at 910 (citing *Kneipp,* 95 F.3d at 1208, n. 2). "[T]he environment created by the state actors must be dangerous; they must know it to be dangerous; and ... [they] must have been at least deliberately indifferent." *Morse,* 132 F.3d at 910 (quoting *Johnson v. Dallas Indep. Sch. Dist.,* 38 F.3d 198, 201 (5th Cir.1994)). The state's actions must "evince a willingness to ignore a foreseeable danger or risk." *Morse,* 132 F.3d at 910.

- 12 -

The "notion of deliberate indifference contemplates a danger that must at least be foreseeable." *Id; see also Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 531 (5th Cir.1994) ("[I]t is not enough to show that the state increased the danger of harm from third persons; the . . . plaintiff must also show that the state acted with the requisite degree of culpability in failing to protect the plaintiff.").

Here, this Court has already determined that, accepting Plaintiffs' facts as true, there is a plausible claim that the danger to E.M.M. was foreseeable. Therefore, the inquiry becomes whether Plaintiffs' facts establish a plausible claim that Defendants acted with a deliberate indifference to E.M.M.'s safety. *Morse,* 132 F.3d at 910. In *Kneipp,* the court found that "police officers' decision to send . . . [a drunk woman] home alone, despite their awareness of her intoxicated and incapacitated state, [w]as evidence of their deliberate indifference." *Id.* (citing *Kneipp,* 95 F.3d at 1208). The facts here are comparable—Plaintiffs have alleged that Defendants were aware of E.M.M.'s risk (enough to document a "high-risk" situation two days after E.M.M.'s birth) while being in the natural parents' custody, yet sent him home with them. (Doc. 15 at 12).

- 13 -

The Court finds that, accepting Plaintiffs' facts as true, there is a plausible claim that Defendants willfully or deliberately disregarded a foreseeable danger to E.M.M. *Iqbal*, 556 U.S. at 678.

### 3. Relationship Between the State and Plaintiffs

The next inquiry of the *Kneipp* test is whether there existed a relationship between the state and the plaintiff, such that the plaintiff was foreseeable. A plaintiff may "bring a state-created danger claim if the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions . . . The primary focus when making this determination is foreseeability." *Morse*, 132 F.3d at 912-13. In other words, a plaintiff must "allege they faced a particular threat of harm which set them apart from the general public." *Id.* ((citing *Commonwealth Bank & Trust Co. v. Russell*, 825 F.2d 12 (3d Cir. 1987) (holding that prison officials were not liable for a murder committed by an escaped prisoner on the grounds that they could not have known that the victims faced any threat greater than the "public at large")).

The issue here is whether Plaintiffs' facts, if true, support a plausible claim that E.M.M. belongs to "a sufficiently discrete group of persons who could have been foreseeable victims." *Morse*, 132 F.3d at 914. Plaintiffs allege that not only were Defendants aware that the natural parents

- 14 -

previously lost their parental rights for other children, but also that they have a dangerous history of drug use and domestic abuse. (Doc. 15 at 10-12). The natural parents had been refusing to undergo court-ordered assessments related to their ability to safely care for a child. *Id.* at 14. Moreover, Defendants initiated dependency proceedings after identifying E.M.M.'s situation as "high-risk." *Id.* at 15. These allegations, taken as true, support a plausible claim that E.M.M. was faced with a "particular threat of harm . . . apart from the general public." *Morse*, 132 F.3d at 912-13 (internal citations omitted); *see also Iqbal*, 556 U.S. at 678.

### 4. Creating Opportunity for Harm

The final element of the *Kneipp* test is whether the state actor "used its authority to create an opportunity which otherwise would not have existed for the specific harm to occur." *Morse*, 132 F.3d at 914. According to the *Morse* Court, "[t]he case law addressing the question whether an affirmative act is required under the state-created danger theory, and if so[,] what constitutes an affirmative act for purposes of liability, is less than clear." *Id.* However, "the dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission." *Id.* at 915 ((citing *Mark v. Borough of Hatboro*, 51 F.3d 1137,

- 15 -

1152 (3rd Cir. 1995) (holding that state actors "used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.")).

However, more recent caselaw supports the notion that Plaintiffs must allege that the state acted affirmatively. In *Phillips*, the Third Circuit stated that "the line between action and inaction may not always be clear. However, we have never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised in some fashion." 515 F.3d at 236. "Our jurisprudence requires that [plaintiffs] allege an affirmative action, rather than inaction or omission." *Id.* (citing *Bright v. Westmoreland County,* 443 F.3d 276, 282 (3d Cir. 2006)). The Court adopts the apparent requirement that Plaintiffs must allege that the state acted affirmatively—Plaintiffs nonetheless meet such a burden.

Here, Plaintiffs allege that by coming to the hospital to perform a risk assessment, Defendants made the natural parents "reportedly unhappy." (Doc. 15 at 8). Thereafter, Defendants determined that E.M.M. was "high-risk," and filed a standard dependency petition, rather than an emergency petition. *Id.* "Defendants knew a standard dependency petition is handled on a non-emergency basis and E.M.M. would remain in the custody of the natural parents until the petition proceeded to adjudication and disposition."

- 16 -

*Id.* Plaintiffs allege that after E.M.M.'s hospital discharge and before the injury, Defendants knew that the natural parents remained non-compliant with court-ordered assessments, nonetheless, Defendants took no action after initiating dependency proceedings against them. *Id.* at 14.

Plaintiffs' facts, taken as true, support a plausible claim that Defendants "placed [E.M.M.] in a dangerous position that was foreseeable." *Morse,* 132 F.3d at 915 (internal citations omitted). Specifically, if Defendants were aware that (1) the natural parents were upset with Defendants' intervention; (2) the natural parents had violent tendencies; and (3) without an emergency status, E.M.M. would remain in his parents' custody; it is plausible that Defendants' actions placed E.M.M. in a dangerous position that ultimately resulted in his injury. *Iqbal,* 556 U.S. at 678. Additionally, the alleged act of intervening at the hospital, infuriating the natural parents with a "high-risk" assessment, and leaving E.M.M. in their custody while waiting for a hearing approximately one month later, if true, constitutes an "affirmative act." *Phillips,* 515 F.3d 224, 236 (3d Cir. 2008).

However, an affirmative act is not enough: the complaint must also plead a direct causal relationship between the affirmative act and E.M.M.'s harm. *Id.* (internal citations omitted). For example, in *Phillips*, there was a causal connection when the defendants provided requested confidential

- 17 -

information about Phillips, and the assailant used such information to hunt down and kill Phillips. *See id.* at 237. The court stated that although Phillips was not killed at the location that the defendants provided, "at [the] preliminary pleading stage, it is reasonable to infer that [the assailant] could have gained relevant information at . . . Phillips' house as to his whereabouts, which could have directly assisted [the assailant] in stalking and killing him." *Id.*

The *Phillips* Court considered the pleaded facts *and* the reasonable inferences therefrom. *See id.* The Court applies the same logic here. At the preliminary pleading stage, it is reasonable to infer that the natural parents with a history of violence, maltreatment of children, and drug abuse, would respond poorly to a hospital intervention at E.M.M.'s expense. Defendants' alleged choice to notify the natural parents that E.M.M. was "high-risk," yet file a standard dependency petition rather than an emergency one, if true, could be found to cause E.M.M.'s injuries.

In sum, under this element, Plaintiffs have sufficiently alleged that Defendants undertook affirmative actions which worked to E.M.M.'s detriment by exposing him to danger, and that there is a direct causal relationship between Defendants' actions and E.M.M.'s injuries. Therefore,

- 18 -

the Court holds that Plaintiffs have sufficiently alleged their §1983 claim under a state-created danger theory. *Iqbal*, 556 U.S. at 678.

## B. §1983 and *Monell*

Finding that Plaintiffs have sufficiently alleged a state-created danger theory of §1983, *Iqbal*, 556 U.S. at 678, we turn now to whether Plaintiffs have sufficiently alleged their §1983 claim under a *Monell* theory. Plaintiffs allege that Defendants County of Luzerne and Luzerne County Children, Youth & Families acted "recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of E.M.M." by having "no policy to guide its employees on how to handle/respond or take the necessary action to take under these circumstances." (Doc. 15 at 26). Plaintiffs state that the "customs, practices, and policies" violated E.M.M.'s rights to, *inter alia*, remain free from abuse. *Id.* at 27. Additionally, Plaintiffs argue that Defendants County of Luzerne and Luzerne County Children, Youth & Families had "no training for its employees on how to handle/respond or the necessary action to take under these circumstances." *Id.* at 25.

Municipalities and their agents are directly liable when the alleged §1983 violation occurs through the execution of official government policies or customs. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). A policy is a decision of a municipality's "duly constituted legislative body" or of

- 19 -

"officials whose acts may fairly be said to be those of the municipality." *B.S. v. Somerset Cnty.*, 704 F.3d 250, 276 (3rd Cir. 2013) (quoting *Bd. Of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 528 U.S. 397, 404 (1997)). A custom is a practice that, although "not . . . formally approved by an appropriate decisionmaker . . . is so widespread as to have the force of law." *Id.*

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of §1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Johnson v. Cty. of Philadelphia,* 975 F.3d 394 (3d Cir. 2020) (quoting *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal citations omitted)).

In order for a failure to train claim to support *Monell* liability, a plaintiff must show "that in light of the duties assigned to [the relevant employees,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Robinson v. Fair Acres Geriatric Ctr.*, 722 Fed. Appx.

- 20 -

194, 199 (3d Cir. 2018) (quoting *Cty. of Canton v. Harris*, 489 U.S. 378, 390, (1989)). However, "'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference" when "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under §1983 without proof of a pre-existing pattern of violations." *Connick,* 563 U.S. at 63 (citing *Bryan Cnty.*, 528 U.S. at 409 (internal citations omitted); *see also Evans v. Columbia Cty.*, 711 F. Supp. 2d 256 (M.D.Pa. 2025).

Here, Plaintiffs' allegations are sufficient to meet these standards. Although Plaintiffs alleged only generally that training was inadequate, the inadequacy of training can plausibly be inferred from Plaintiffs' allegations and the severity of this incident. It is therefore plausible that the incident was "so patently obvious" that Defendants acted "deliberately different to the need." *Connick,* 563 U.S. at 63; *Robinson*, 722 Fed. Appx. at 199. Therefore, the Court finds that Plaintiffs have sufficiently alleged their §1983 claim under a *Monell* theory at this stage of the proceedings. *Iqbal*, 556 U.S. at 678.

## IV.    CONCLUSION

The Court concludes that Plaintiffs have stated a plausible claim upon which relief can be granted. Therefore, Defendants' motion to dismiss will be **DENIED.** An appropriate order will be issued.

MALACHY E. MANNION
United States District Judge

**DATE:** 5/1/26
25-1732-01

- 22 -